

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-24-00288-CV

---

IN THE INTEREST OF J.P., A CHILD

---

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 097743-D-FM, Honorable Carry Baker, Presiding

---

February 5, 2025

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Father, R, appeals the trial court's judgment by which his parent-child relationship with his daughter, JP, was terminated. On appeal, he challenges the sufficiency of the evidence supporting the trial court's finding that predicate grounds and JP's best interest support termination of the relationship. We affirm.

### Background

R and G were the parents of JP, their daughter who was one year old at the time of trial.

R and G had been in a relationship for nearly fifteen years.  R knew that G had a years-long history of unaddressed alcohol abuse.  R also knew that, as a result of G's alcoholism and domestic violence in the home, four other children had been removed from the couple's custody and had not had contact with R and G in years.  R's and G's parental rights to their oldest child were terminated, and that termination arose, in part, from G's earlier abuse of alcohol.  The record reveals that the four earlier born children lived with their paternal grandmother in Florida, though G testified that she was not certain with whom some of their children lived.  Indeed, when asked "so who is the grandma that has all four of these kids that you testified about?"  G answered, "How am I supposed to know this?"

Days after JP was born, the couple were living in a hotel paid for by the Department.  After having been on a trucking job, R returned to the hotel room to find G unconscious lying right next to the newborn JP.  Noting that G was not breathing and had no pulse and suspecting, based on a conversation with a woman in the neighboring room, that G had also taken morphine, R administered Narcan, started chest compressions, and summoned emergency services.  G said, in a stupor after having been revived, that she had consumed a great deal of alcohol and had taken morphine as well, a point she later denied.  She admitted to the responding paramedics that she had begun drinking again since JP was born.  R noted that "this happens all the time."  Shortly after G became oriented, she attacked R and, consequently, R suffered a heart attack and was hospitalized for days.  G was arrested.

JP was left with people in a nearby hotel room with whom G and R had become acquainted over a week's time and whom R knew to have had some history with the

2

Department. When the Department learned that the neighboring hotel guests now ersatz caretakers of JP also had an extensive history of Department involvement and having been made aware that R was ordered to bedrest for some time, the Department removed JP from the neighboring caretakers and took custody of the newborn. The infant has been in a foster home since that time and thriving in that environment.

R recovered from his heart attack and began to try to get his life in order for his child. However, it became necessary for R and G to move back to Michigan where the Department could not provide services to R free of charge. The only available service was drug testing, which R refused to take after the first test demonstrated that he had not been taking drugs. He maintained that, in order for him to keep his truck-driving job, he had to undergo testing and further testing should not be ordered. Neither parent made any significant progress in terms of undertaking the ordered services, either in Texas or in Michigan.

Early in the matter, R appeared to have made efforts to arrange childcare and his work schedule to allow him to be home every night. Yet, the Department cited evidence that not only he and G were continuing to live together and carry on their relationship but also G had not availed herself of any of the proposed treatment plans for her alcohol abuse. Consequently, the Department was unconvinced that JP would not be left in G's care again.

R's once rather stable employment appeared to falter for some time in Michigan, at which time he worked in landscaping and snow removal. At the time of the final hearing, however, he had resumed driving a truck as an occupation. R and G were reunited and living on the road, though they did live for some time with G's father in

3

Michigan.  Both R and G were in the process of applying for disability payments.  Both parents expressed general, unrealized plans they had for caring for JP should she be returned to them.

Ultimately, the trial court terminated both R's and G's parental rights to JP.  G has not appealed the trial court's judgment.  R appealed and maintains that the evidence was legally and factually insufficient to support the trial court's findings that both predicate grounds in subsection (D) and (O) and the best interest of the child supported termination.  We affirm.

### Predicate Grounds for Termination

The standards for reviewing the sufficiency of the evidence in termination of parental rights are well-established and described most recently in *In re J.F.-G.*, 627 S.W.3d 304 (Tex. 2021).  We apply them here.

The Texas Family Code permits termination if the parent knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the child's physical or emotional well-being.  TEX. FAM. CODE ANN. § 161.001(b)(1)(D).  "'[E]ndanger' means to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d at 312.  "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child[ren] but the parent disregards that risk." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.).

R knew of G's history with alcohol abuse.  So too did he attribute the relinquishment of their four other children to the discord and struggles associated with the alcohol abuse in which G and G's mother engaged.  Despite knowing that, he left newborn JP in G's care.  This was the very same G (mother) who seemingly had little interest in and contact

4

with the couple's other children of tender years, and the very same woman whose alcohol abuse influenced the termination of parental rights to the couple's eldest child. Additionally, R attempted to explain that he regularly carried Narcan (a substance used to counteract drug overdose) because he was once a medic. This suggests that as a medic he was trained in the use and administration of drugs to address particular conditions. What makes this telling is his decision to administer Narcan to revive an unconscious G as opposed to attempting other means of resuscitation; he used a drug to counteract drug overdoses.

The record also reveals that there was a history of domestic violence between the couple. This further was evidenced when G assaulted R in the motel room and apparently precipitated his heart attack. From testimony concerning the couple's relationship with their other children, it would appear that domestic violence and associated criminal conduct was not a new development. This is telling, for a parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children. *See In re I.G.,* 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.). Domestic violence and R's refusal to remove himself and JP from the relationship with G represented a clear potential danger to JP's well-being; R disregarded that risk and demonstrated the distinct likelihood that he would continue to disregard it.

Together, the foregoing evidence presented was such that the trial court could reasonably form a firm belief or conviction that R knowingly placed or knowingly allowed JP to remain in conditions or surroundings which endangered her physical or emotional well-being. We overrule R's contentions that the evidence was legally and factually insufficient.

Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). That being so, we need not address R's challenge to the sufficiency of the evidence supporting the trial court's finding that subsection (O) likewise supported termination.

### Best-Interest Finding

In addition to finding that a predicate statutory ground supports termination, the trial court must also find by clear and convincing evidence that termination of the parent-child relationship favors the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). When assessing the evidence regarding the trial court's best-interest determination, we consider the factors itemized in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).[1] Although those factors are not exhaustive, they indicate a number of considerations which either have been or would appear to be pertinent. *Holley*, 544 S.W.2d at 372. Additionally, evidence establishing the statutory grounds for termination may also be considered in the assessment of best interests. *See In re E.P.*, No. 07-23-00449-CV, 2024 Tex. App. LEXIS 3671, at *5–6 (Tex. App.—Amarillo May 29, 2024, pet. denied) (mem. op.). Comparing the evidence described earlier with *Holley* and other relevant indicia leads us to conclude that the trial court's best-interest finding had the support of both legally and factually sufficient evidence.

---

[1] The *Holley* factors are as follows: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist these individuals to promote the best interest of the child; 6) the plans for the child by these individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

6

Initially, we consider the evidence of 1) endangerment mentioned above, 2) the prior termination of the parental relationship regarding one child relating to alcohol abuse, and 3) the de facto repeated relinquishment of care over their four other children to another person. Courts may view past as prologue. *See In re E.P.*, 2024 Tex. App. LEXIS 3671, at *6 (so noting). We cannot say that a fact-finder would be remiss in concluding that JP would be the fifth child to receive little to no long-term attention and care. This is especially so when we encountered little evidence indicating R attempted to retain or care for his other children.

JP's tender age prevents us from knowing her desires, but the record does show that she is thriving in the care of her foster family. Both parents refused to undertake the court-ordered services delineated in their family services plans. Though R appeared to have maintained gainful employment for most of the proceeding, he failed to establish a stable home. Though both R and G acknowledged that G needed professional counseling and/or rehabilitation in order to work through her substance abuse issues, she did not engage in such services.

R's expressed plans for JP's care were general, at best. Despite showing some progress earlier in the case by arranging childcare and work and making efforts to get settled and stable, we see that instability returned as did R's relationship with G. In light of their continued or rekindled relationship, the trial court had evidence to suggest that JP could again be endangered under G's supervision. The risk of future physical and emotional danger to JP is significant given the evidence before us.

In light of the foregoing evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination was in the best interest of JP, and we overrule R's contentions to the contrary.

Having overruled R's issues on appeal, we affirm the trial court's judgment terminating the parent-child relationship with JP.


Per Curiam